IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Thomas Lucas, on behalf of Ivy McCoy,    :
                            Plaintiff     :    Civil Action 2:11-cv-00429

            v.                            :    Judge Economus

Michael J. Astrue,                        :    Magistrate Judge Abel
Commissioner of Social Security,
                            Defendant     :


**REPORT AND RECOMMENDATION**

Plaintiff Thomas Lucas, on behalf of Ivy McCoy, brings this action under 42

U.S.C. §§405(g) for review of a final decision of the Commissioner of Social Security

denying Ms. McCoy's application for Social Security Disability and Supplemental

Security Income benefits.  This matter is before the  Magistrate Judge for a report and

recommendation on the parties' cross-motions for summary judgment.

**Summary of Issues.** Plaintiff Ivy McCoy filed for Disability Insurance Benefits

and Supplemental Security Income ("SSI"). The administrative law judge issued a

decision and concluded that McCoy had the residual functional capacity to perform a

range of light work, including both her past work as a cashier and other jobs that

existed in significant numbers in the national economy. Ivy McCoy died in 2009 after

requesting that the Appeals Council review the decision of the administrative law

judge. (Doc. 788-89.) Defendant filed an unopposed motion to dismiss plaintiff's claim

for Supplemental Security Income benefits on the basis that her son, Thomas Lucas, did

not have standing to pursue the Title XVI claim for SSI benefits. On March 7, 2012, the

Magistrate Judge recommended that defendant's partial motion to dismiss be granted.

Plaintiff argues that the decision of the Commissioner denying benefits should be

reversed because:

- The administrative law judge failed to follow the treating physician rule; and,
- The administrative law judge failed to properly evaluate McCoy's credibility.

**<u>Procedural History.</u>**  Plaintiff Ivy McCoy filed her application for disability

insurance benefits on March 30, 2006, alleging that she became disabled on January 31,

2004, at age 40, by lupus, lower back pain, degenerative disc disease, poor vision, heart

condition, "c3, 4, 5, 6, 7-squished", arthritis, bone spurs, high blood pressure, anxiety,

herniated discs at L3, 4, 5, S1.  (R. 120, 211-12.)  The application was denied initially and

upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law

judge.  On July 3, 2008, an administrative law judge held a hearing at which plaintiff,

represented by counsel, appeared and testified.  (R. 804.) On January 8, 2009, a second

hearing was held. A medical expert, a psychological expert and a vocational expert also

testified. (R. 837.)  On February12, 2009, the administrative law judge issued a decision

finding that McCoy was not disabled within the meaning of the Act.  (R. 19-36.)  On

March 23, 2011, the Appeals Council denied plaintiff's request for review and adopted

the administrative law judge's decision as the final decision of the Commissioner of

Social Security.  (R. 2-4.)

**Age, Education, and Work Experience.**  Ivy McCoy was born February 4, 1963. (R. 120.) She has her GED.  (R. 217.) She completed beauty school. (R. 809.) She has worked as a billing clerk, gas station and convenience store clerk, collections representative, an instructor at a beauty school, a manager, a hair stylist, and a sales clerk. (R. 197.) She last worked March 19, 2006.  (R. 212.)

**Plaintiff's Testimony.**  The administrative law judge fairly summarized McCoy's testimony as follows:

> The claimant testified that she has been unable to work due to constant back and leg pain, diabetes mellitus, leg numbness two to three times a week, being scared most of the time, having a depressed mood and feeling helpless 70% of the time. The claimant testified that she stopped working because she was terminated for being "sick." The claimant testified that her back pain feels "like a knife" and that her leg pain feels the same. The claimant testified that "trigger shots" did not help her. The claimant that she cries during the day at least once or [twice] a week because the pain bothers her thinking. The claimant testified that she takes psychotropic medication and that is has not changed her mood or the way that she does things. The claimant testified that she does not suffer from any adverse medication side effects.

> The claimant testified that, as a result of pain, she cannot remain seated for more than 30 minutes before she has to move around for 10 minutes. She stated that when she stands the pain is more intense. The claimant presented at the July 2008 hearing with a walker, but she testified at the January 2009 hearing that she left the walker in her truck. The claimant testified that she has been using a walker for two years and that Dr. Tribuzio prescribed a walker because she kept falling. At the January 2009 hearing, the claimant testified that she was able to walk from the parking lot into the hearing room without the walker. The claimant testified that lifting and carrying "affects" her back, but that she can lift/carry up to 5 pounds. She stated that she has "problems" with bending and reaching down and that she cannot kneel because she will "get stuck" and the pain gets worse. She also allegedly experiences difficulty with bending over.

Additionally, the claimant stated that she loses feeling in her hands and will drop things.

The claimant testified that she does not go out with friends and that the only places she goes are to doctor's appointments, Sutton Place Behavioral Health and to see one neighbor. She stated that during the day she reads, watches television and draws. The claimant testified that she watches about six hours of television per day and enjoys the History and Discovery channels. She testified that she draws with charcoal and colored pencils, but that she not done this in the past six months. The claimant testified that she has problems with reading because she has to read the same thing over and over again. The claimant testified that her boyfriend works from six to midnight and gets home around 1:30 AM. The claimant reported to the Social Security Administration that she enjoys watching television, reading, working with beads and paint and working on her computer (Exhibit 4E, p. 5).

The claimant testified that she prepares and eats grilled cheese sandwiches and that she otherwise relies on her boyfriend to cook and shop for groceries and to assist with household chores. She stated that she is able to prepare microwave meals or make a sandwich. At the July 2008 hearing, the claimant testified to having a valid driver's license. She initially testified that she does not drive "at all," but subsequently stated that she last drove two months earlier. At the January 2009 hearing, the claimant testified that she did not remember when she last drove. She then stated that, after her falling episodes, she was told by her doctors that she should not drive. The claimant told Dr. Lucas that she enjoys walking on the beach (Exhibit 4F, p.2) but at the January 2009 hearing, the claimant testified that she had not walked on the beach during the preceding year and a half.

(R. 28-29.)

**Medical Evidence of Record.** The administrative law judge's decision fairly sets out the relevant medical evidence of record. This Report and Recommendation will only briefly summarize that evidence.

**Physical Impairments.**

Daniel S. Rowe, M.D. On December 1, 1997, Dr. Rowe, a pain management physician, examined plaintiff and diagnosed probable lumbar spondylosis with degenerative disc and joint disease, lumbar facet and sacroiliac joint arthropathy, chronic mechanical lumbosacral strain, and myofascial pain syndrome. (R. 529.)   On April 21, 1999, Dr. Rowe stated that a recent cervical MRI revealed mild degenerative disc disease throughout the lower cervical spine with a mild right-sided disc protrusion with bony spurring at C5-6 and minimal disc bulging at C4-5 and C6-7. Plaintiff complained of severe and intractable neck pain with paresthesias in the right upper extremity in a C-6 distribution. (R. 539.) On September 9, 1999, Dr. Rowe indicated that plaintiff had undergone bilateral lumbar face rhizotomy by cryoablation as well as sacroiliac joint denervation by cryoblation without any long term benefit. (R. 537.) On November 24, 1999, Dr. Rowe stated that chronic narcotic therapy was indicated based on the failure of more conservative measures. (R. 536.)

Russell D. Metz, M.D. On September 10, 2002, Dr. Metz evaluated plaintiff based on her complaints of a two year history of a rash on her face, upper chest, upper back, posterior neck and upper outer arms. Plaintiff met the diagnostic criteria for lupus. A biopsy was recommended. (R. 525.) On September 17, 2002, Dr. Metz diagnosed chronic lupus erythematosus. On examination, plaintiff had 1+ joint edema of the bilateral ankles and knees. (R. 526.)

James D. Popp, M.D. On October 15, 2002, Dr. Popp, a rheumatologist, examined plaintiff. Plaintiff reported that five years ago, she developed a lesion on her left forehead, which resolved. She developed another lesion on her forehead. In February or March 2002, plaintiff developed a diffuse erythematous rash on her face and chest. A biopsy was consistent with cutaneous lupus. Plaintiff also reported locking of her fingers and pain in her knees, ankles, wrist, and elbows. She was forgetful and drifted in and out of conversations. She had lower extremity swelling, probable photosensitivity, dry eyes, dry mouth, purple discoloration of her fingers in cold weather, intermittent cough and dyspnea. She also reported "massive" headaches.

On physical examination, her cervical spine was stiff. She had pain with lateral rotation. Her shoulders, elbows, and wrists, had normal range of motion without pain or swelling. Her right third PIP joint was mildly enlarged. She had no Raynaud's phenomenon or cyanosis. Her lower extremity joints revealed good range of motion with no effusions. Her skin revealed erythema and areas of hyperpigmentation in a malar distribution and on her forehead. She also had erythematous macular paular lesions on her chest. Her motor strength was grossly normal. Her deep tendon reflexes were 2+ and symmetrical. (R. 522-23.)

An October 23, 2002 x-ray of plaintiff's left shoulder showed that skeletal structures were intact with no sign of acute trauma. The joint spaces and surfaces were well preserved. There was no effusion. The soft tissues showed no abnormal calcifications or foreign body. (R. 248.)

On March 23, 2006, plaintiff underwent an adenosine induced cardiolite rest/stress study. Her results appeared normal with no evidence of reversible ischemia. She had preserved left ventricular function with an ejection fraction of 60%. (R. 234-36.)

<u>Farid Ullah, M.D., F.A.C.C.</u> On June 8, 2006, Dr. Ullah examined plaintiff. Plaintiff complained of low back pain with numbness and weakness of both legs, worse on the right. In 1996, she was told that she had a bulging disc, which caused 30% loss of sensation. She had been treated with radio-frequency ablation, cryosurgery, epidural injections and physical therapy. She also reported problems with her C3, 4 and 5 vertebrae. She had weakness in both upper extremities. She dropped things and had difficulty putting anything on the shelf above her head. Her neck was stiff and painful.

Plaintiff also had extremely poor oral hygiene. She had multiple carious teeth, broken teeth, gum, hypertrophy with overgrowth.

During the physical examination, plaintiff was extremely distraught. She wept throughout the visit. She mumbled and appeared significantly depressed. Her face had a red rash consistent with lupus and multiple scars of ulcers and/or biopsies. She had some mild paralumbar muscle spasm with tenderness. She had difficulty in forward flexion; some limitation was due to obesity and some due to muscle spasm. Plaintiff walked without any assistive device, but she had a slight to moderate limp.

Dr. Ullah diagnosed lumbar osteoarthritis with probable lumbar disk disease with possible secondary neuropathy, severity to be determined; history of cervical disk disease; migraine syndrome; smoker's bronchitis; carious teeth with hypertrophy of the

gums; memory loss probably secondary to multiple analgesics and sedative

medications; and severe anxiety and depression. (R. 271-74.)

Donald Morford, M.D. On July 28, 2005, Dr. Morford completed a physical

residual functional capacity assessment. Dr. Morford concluded that plaintiff could

frequently lift and/or carry 10 pounds. She could stand and/or walk at least 2 hours in

an 8-hour day. She could sit with normal breaks for about 6 hours in an 8-hour day. Her

ability to push and/or pull was unlimited. Dr. Morford noted that plaintiff was

diagnosed with discoid lupus, poorly controlled hypertension, headaches, smoker's

bronchitis, and neck and back pain. On July 27, 2006, plaintiff noted that her cardiac

symptoms remained unchanged since the March 23, 2006 cardiolite stress test.

Dr. Morford opined that plaintiff could occasionally climb ramps or stairs,

balance, stoop, kneel, crouch, or crawl. She could never climb ladders, ropes, or

scaffolds. With respect to environmental limitations, plaintiff should avoid concentrated

exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (R. 295-302.)

Edward D. Tribuzio, M.D. Dr. Tribuzio, plaintiff's treating physician, provided

treatment notes for the time period November  2001 through June 2009. On December

20, 2001, plaintiff reported that her roommate had stolen her pain medications. (R. 535.)

On August 15, 2005, plaintiff complained of migraines and cervical pain. On

September 19, 2005, plaintiff was crying and complaining of pain all over. She had an

unsteady gait, and her right leg was giving out. She was not sleeping. She complained

of headaches. On September 19, 2005, plaintiff complained of increasing pain while

8

working. Dr. Tribuzio suggested she start disability evaluation. On January 9, 2006, Dr. Tribuzio noted that plaintiff had been doing fairly well and that there was no change in her back examination. On February 6, 2006, plaintiff was described as stable. On April 20, 2006, plaintiff had increasing pain down her back. Her blood pressure was fairly controlled. On July 6, 2006, Dr. Tribuzio noted that her back pain was under fair control. On May 31, 2006, Dr. Tribuzio indicated that plaintiff could not work because of chronic back pain. On September 21, 2006, plaintiff was tearful and reported that her roommate had stolen her medications. Dr. Tribuzio was unwilling to prescribe new medications. On December 18, 2006, plaintiff provided a police report indicating that her medications had been stolen. On January 15, 2007, plaintiff was given a two month supply of her medications. On February 16, 2007, plaintiff reported that she needed a refill of her methadone. On March 7, 2007, plaintiff asked for her methadone refill one month early, but Dr. Tribuzio refused to provide it to her. On March 30, 2007, a one month prescription was given to her. On May 15, 2007, Dr. Tribuzio noted that plaintiff was taking methadone to control her pain and there had been no history of any abuse. On May 22, 2007, plaintiff required a refill for her pain medication for her headaches. On May 24, 2007, plaintiff reported that her friend stole her Xanax, and Dr. Tribuzio provided a prescription to her.

On June 6, 2007, plaintiff reported she had recently been hospitalized. She was diagnosed with diabetes. On June 13, 2007, plaintiff was seen to evaluate her blood sugars. On July 3, 2007, plaintiff was started on Lantus. On July 18, 2007, Dr. Tribuzio

indicated that plaintiff had not been taking her insulin as prescribed. Dr. Tribuzio saw plaintiff weekly in August 2007 in order to address her diabetes. Throughout September and October, Dr. Tribuzio monitored plaintiff's blood sugar. In October and November, plaintiff's diabetes was under fair control. (R. 362-79.)

On January 7, 2008, plaintiff was seen for follow up. She denied any particular complaints. Her back pain and headaches had been controlled nicely. On January 23, 2008, plaintiff complained of a 3-day headache. On February 18, 2008, plaintiff fell in the parking lot at home. (R. 409.) On April 28, 2008, Dr. Tribuzio reported that plaintiff had had some recent falls probably related to weakness in her legs. (R. 408.)

On March 14, 2008, Dr. Tribuzio completed a form indicating that plaintiff had L3 dysfunction, neuropathy of both legs and decreased strength of 2/5, and decreased sensation. Her grip strength was 4/5 bilaterally. He described her gait as wide and wide. She could not walk on her heels or toes. She could not squat. Her legs gave out requiring the use of a walker. He indicated that plaintiff had neuropathy of the lower extremities due to lumbar and cervical pathology. He opined that plaintiff was disabled. (R. 398.)

On September 8, 2008, Dr. Tribuzio indicated that plaintiff had reduced her methadone use and that he was attempting to decrease it further. On October 3, 2008, Dr. Tribuzio indicated that plaintiff's diabetes was poorly controlled. Plaintiff had radiating back pain down her back. (R. 748.) On November 8, 2008, Dr. Tribuzio

indicated that plaintiff had been doing fairly well and denied any particular problems. (R. 749.) On November 20, 2008, plaintiff was described as doing fairly well. (R. 764.)

On February 5, 2009, Dr. Tribuzio stated that plaintiff had a seizure which started in the left leg, radiated into the big toe, and then became generalized. On February 19, 2009, plaintiff reported no further seizures. She was doing well. An MRI showed no acute abnormalities, although she did have ill-defined, nonspecific H2 lesion that had decreased since 2007. (R. 765.)

Nicolas Bancks, M.D. On October 24, 2006, Dr. Bancks reviewed the record for the Commissioner and completed a physical residual functional capacity assessment. Dr. Bancks opined that plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. She could stand and/or walk about 6 hours in an 8-hour day. She could sit with normal breaks for about 6 hours in an 8-hour day. She was unlimited in her ability to push and/or pull. She could occasionally climb ladders, ropes or scaffolds. She could occasionally stoop, kneel, and crawl. She should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation and hazards. (R. 303-10.)

Baptist Medical Center. On May 26, 2007, plaintiff was admitted to the hospital for syncope or recurrent falls and an abnormal MRI scan. (R. 325-30.)

James J. Green, M.D. On March 20, 2008, Dr. Green completed a physical residual functional capacity assessment. (R. 399-406.) Dr. Green opined that plaintiff could occasionally lift and/or carry 10 pounds and frequently lift and/or carry less than 10

pounds. She could stand and/or walk less than 2 hours in an 8-hour day. A medically

required hand-held assistive device was necessary for ambulation. Her ability to push

and/or pull was limited in her lower extremities. Dr. Green wrote:

> This 45 year old female has a long history of pain of the back and legs,
> with a history of DDD, DJD of the ankles, HTN, and discoid lupus.
> Longitudinal records reveal decreased spinal ROM, swelling and
> tenderness in the ankles with a limping gait. She has also developed
> diabetes, and not has a marked peripheral neuropathy with inability for
> ambulation without assistance, currently using a walker with marked LE
> weakness and loss of sensation. I feel that she has less-than-sedentary
> capability.

(R. 400.)

### **Psychological Impairments.**

<u>Lauren Lucas, Ph.D.</u> On June 5, 2006, Dr. Lucas, a psychologist, performed an

personality assessment at the request of the Office of Disability Determinations.

Plaintiff's presentation was described as histrionic. She reported that her boyfriend

visited her and completed her housework and laundry. She did not visit with other

friends or relatives. She watched television, but she did not read. She did not cook. She

enjoyed walking on the beach.

Plaintiff reported that she had no appetite and had difficulty sleeping. Her mood

was described as average. Dr. Lucas diagnosed an Axis II disorder, cluster B; pain

disorder with psychological and medical features; and dysthymic disorder.  She had

poor insight and fair judgment. (R. 268-70.)

Martha Putney, Ph.D. On June 15, 2006, Dr, Putney completed a psychiatric review technique. She concluded that plaintiff had an adjustment disorder with dysthymic mood and anxiety. Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social function. She had also had mild difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. Dr. Putney indicated that plaintiff's anxiety was due to her physical condition. She quit working based on her physical symptoms. With respect to her activities of daily living, plaintiff was able to prepare meals, shop, perform self-care, complete household chores, manage money and drive as permitted by her physical limitations. She was able to get along with the public and authorities, and she had never been fired. Dr. Putney also noted that plaintiff had not had mental health treatment. (R. 275-88.)

Val Bee, Psy.D. On November 7, 2006, Dr. Bee completed a psychiatric review technique. Dr. Bee opined that plaintiff satisfied the diagnostic criteria for dysthymia. Dr. Bee also opined that plaintiff had a pain disorder and cluster B features of a personality disorder. Dr. Bee opined that plaintiff had mild restriction of daily activities, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  (R. 311-24.)

Sutton Behavioral Health. On January 2, 2007, plaintiff was evaluated for services. Plaintiff reported symptoms of thought blocking, feelings of detachment, anhedonia, difficulty sleeping, and difficulty concentrating. Plaintiff was diagnosed with post-traumatic stress disorder. (R. 353-61.)

13

On June 27, 2007, Heather Rohrer, M.D. began treating plaintiff. On mental status examination, plaintiff showed some psychomotor retardation. She was alert and oriented. Her thoughts were logical and goal-directed. Speech was whiny and slightly delayed.  Plaintiff could perform simple calculations but refused to try serial calculations without a paper and pen. She had adequate concentration. Her memory had some impairment. She cried throughout the appointment. She denied hearing voices but she reported hearing noises that scared her. Dr. Rohrer found her quite paranoid about her family. (R. 346-48.) On August 1, 2007, plaintiff exhibited some psychomotor retardation. She spoke slowly and tended to slur her speech. She reported that she saw shadows at night. (R. 343.)

On August 6, 2007, Dr. Rohrer completed a psychiatric impairment questionnaire concerning plaintiff's treatment from June 27 through August 1, 2007. Dr. Rohrer saw plaintiff on a monthly basis. She diagnosed post-traumatic stress disorder; generalized anxiety disorder; dysthymia; and a rule out diagnosis of dependent personality disorder. She assigned a Global Assessment of Functioning ("GAF") score of 50. She noted the following clinical findings: poor memory, appetite disturbance with weight change, sleep disturbance, mood disturbance, substance dependence, psychomotor retardation, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, perceptual disturbances, decreased energy, generalized persistent anxiety and pathological dependence or passivity. She noted that plaintiff heard noises and saw shadows at night. Dr. Rohrer noted that plaintiff was

mildly limited in her ability to remember locations and work-like procedures and moderately limited in her ability to understand and remember one or two step instructions. She was moderately limited in her ability to carry out simple one or two-step instructions and to maintain attention and concentration for extended periods. She was also moderately limited in her ability to make simple work related decisions. Her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was markedly limited. Plaintiff was markedly limited in her ability to interact appropriately with the general public. Her ability ask simple questions or request assistance was mildly limited. Her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes was markedly limited. Her ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness was mildly limited. Dr. Rohrer noted that plaintiff kept a small bat with her at all times and a knife when she was alone. Dr. Rohrer also believed that plaintiff was limited by her physical problems and that her high dose of methadone adversely affected her mobility and cognitive function. Plaintiff's anxiety and depression exacerbated her physical pain and vice versa. Dr. Rohrer opined that plaintiff was incapable of even low stress work.

On September 5, 2007, plaintiff reported that she was doing okay. She had racing thoughts, but she believed that the Seroquel calmed her down. Her appetite and sleep were poor. Plaintiff's mood was anxious with appropriate affect. Her motor activity was

normal, and her cognitive function was fair. (R. 341.) On September 27, 2007, plaintiff's mood was euthymic. (R. 340.) On November 1, 2007, plaintiff was described as euthymic.

On January 16, 2008, plaintiff's affect was dysphoric. Her sleep was poor. She reported seeing things in passing. She complained that the Seroquel was not working. Her appetite was normal. She stated she had short-term dementia. She reported that she had had a panic attack the week before. Dr. Rohrer noted that her PTSD and anxiety disorder had deteriorated and that her GAF score was 52.

On May 8, 2008, plaintiff reported that her mood was "getting lower" because of Mother's day. Her affect was dysphoric, and when she talked about Mother's day, she became tearful. She reported that she had been talking to an imaginary friend. She had difficulty falling and staying asleep. Her appetite was poor. Dr. Rohrer indicated that her PTSD and generalized anxiety disorder were in fair control and assigned a GAF score of 55. (R. 410.)

On September 8, 2008, plaintiff reported feeling depressed and worthless. Her affect was anxious and dysphoric. She appeared fairly paranoid. Her current GAF score was 55. (R. 736.)

On November 21, 2008, Dr. Rohrer completed a psychiatric impairment questionnaire. She diagnosed post-traumatic stress disorder and a generalized anxiety disorder. She assigned a current GAF score of 55 and indicated that her lowest GAF score in the past year was 52. She noted the presence of the following clinical findings:

appetite disturbance with weight change, sleep disturbance, mood disturbance, substance dependence, psychomotor retardation, blunt affect, and generalized persistent anxiety. Plaintiff complained of poor sleep and racing thoughts. Plaintiff was moderately limited in her abilities to remember locations and work-like procedures and to understand and remember detailed instructions. She was mildly limited in her ability to carry out simple one and two-step instructions. She was moderately limited in her abilities to carry out detailed instructions and to maintain attention and concentration for extended periods. She was markedly limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was also moderately limited in her abilities to interact appropriately with the public, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. She was mildly limited in her ability to set realistic goals or make plans independently. (R. 739-46.)

On December 30, 2008, Dr. Rohrer assigned a GAF score of 55. Plaintiff complained of not being able to sleep. She reported hearing things that were not there. She described her brain as going in circles. (R. 769.) On May 5, 2009, plaintiff reported she was angry because she was tired of everything. She appeared paranoid. (R. 776.)

Richard K. Lyon, Ph.D. On January 28, 2008, Dr. Lyon completed a psychiatric review technique and mental residual functional capacity assessment. Plaintiff met the

diagnostic criteria for dysthymia, post-traumatic stress disorder, and generalized anxiety disorder. Plaintiff had a rule out diagnosis of cluster B personality traits. Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. She had no episodes of decompensation.

Dr. Lyon opined that plaintiff had no significant limitations with respect to understanding and memory. Plaintiff was moderately limited in her abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Plaintiff was moderately limited in her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. She was also moderately limited in her ability to respond appropriately to changes in the work setting. (R. 380-97.)

Medical Expert Testimony. Javier Barquet, M.D., testified as a medical expert. He testified that he could not correlate the level of plaintiff's pain with the MRI results. He acknowledged that an underlying psychological condition could contribute to her level of pain. Dr. Barquet testified that plaintiff could sit, stand or walk for 6 hours in an 8-hour day, lift 10 pounds frequently and 20 pounds occasionally. Dr. Barquet maintained

that Dr. Tribuzio simply recorded plaintiff's complaints. He also testified that

methadone is not prescribed for pain.

Olin Hamrick, Ph.D. testified that plaintiff had mild limitations in activities of

daily living, social functioning, and in maintaining concentration, persistence, or pace.

Plaintiff was mildly limited in her ability to understand, remember and carry out simple

instructions and moderately limited in her ability to interact with the general public, co-

workers, and supervisors. Plaintiff was moderately limited in her ability to make

changes in work or work-like settings. Dr. Hamrick testified that a GAF score of 40 to 50

indicated that she had a severe mental impairment, but he did not give much weight to

such scores because they were not reliable.

**Administrative Law Judge's Findings.**

1. The claimant meets the insured status requirements of the Social
   Security Act through March 31, 2009.

2. The claimant has not engaged in substantial gainful activity since
   February 2, 2006, the amended alleged onset date (20 CFR 404.1571
   *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: a history of
   degenerative disc disease of the cervical spine; obesity; diabetes
   mellitus; post-traumatic stress disorder; generalized anxiety
   disorder; narcotic dependence/substance abuse disorder (20 CFR
   404.1521 *et seq.* and 416.921 *et seq.*).

4. The claimant does not have an impairment or combination of
   impairments that meets or medically equals one of the listed
   impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
   404.1525, 404.1526, 416.925 and 416. 926).

5.     After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except with only occasional bending, stooping, crouching, crawling; no work at heights based on the claimant's reports of syncope; "mild" limitations in her ability to understand, remember and carry out simple instructions and make judgments on simple decisions; "moderate" limitations in her ability to understand remember, and carry out complex, but not detailed instructions, interact appropriately with the public, supervisors, and co-workers, respond appropriately to usual work situations and to changes in a routine work setting. "Mild" is defined as a slight limitation, but the individual can generally function well; "moderate" is defined as more than a slight limitation, but the individual is still able to function satisfactorily.

6.     The claimant is able to perform past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on February 4, 1963 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963). She is currently 46 years old.

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404. 1569, 404.1569a, 416.969, and 416.969a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from February 2, 2006 through the date of this decision (20 CFR 404.1520(f) & (g) and 416.920(f) & (g)).

(R. 21-35.)

**Standard of Review**.  Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'"  *Id.*  *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'"  *Beavers v. Secretary of Health, Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)(quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments.**   Plaintiff argues that the decision of the Commissioner denying benefits should be reversed because:

- The administrative law judge failed to follow the treating physician rule. The administrative law judge failed to given any significant weight to the opinion of Dr. Rohrer, plaintiff's treating psychiatrist. The administrative law judge

noted that Dr. Rohrer did not define what she meant by "marked" and "moderate" limitations or what evidence supported these limitations. Plaintiff argues that these limitations were defined and that Dr. Rohrer specified the clinical findings on which her opinion was based. Rather than adopting the opinion of Dr. Rohrer, the administrative law judge adopted the opinion of Dr. Hamrick, a non-examining psychologist. Plaintiff maintains that Dr. Rohrer performed a mental status evaluation at each appointment. Plaintiff argues that because Dr. Rohrer's opinion was based upon appropriate clinical and diagnostic psychiatric evidence and not otherwise contradicted by substantial evidence, her opinion should have been afforded controlling weight. Plaintiff also argues that the administrative law judge failed to consider any of the factors outlined in 20 C.F.R. § 404.1527 before rejecting her opinion. Plaintiff maintains that Dr. Rohrer examined her for a period of at least 17 months. She provided specific psychiatrist findings to support her medical opinions, and her findings were consistent with the record as a whole. Furthermore, Dr. Rohrer is a Board-certified psychiatrist. Plaintiff also argues that the administrative law judge erred in rejecting the opinion of Dr. Tribuzio. Dr. Tribuzio noted that plaintiff had a lower back dysfunction with neuropathy in the legs, decreased leg strength, reduced grip strength, and a need for a walker. Plaintiff maintains that the administrative law judge should not be permitted to disregard the findings of plaintiff's long term treating physician

without making any effort to clarify perceived inconsistencies in the record. The administrative law judge should have requested that the treating doctor give an opinion on plaintiff's functional limitations.

- <u>The administrative law judge failed to properly evaluate McCoy's credibility</u>. Plaintiff argues that the administrative law judge is not permitted to make credibility determinations based upon an intangible or intuitive notion about an individual's credibility. Rather, determinations must be based on consideration of the entire record. Plaintiff argues that the administrative law judge' findings were insufficient to discredit her testimony regarding her physical and mental limitations. The evidence demonstrated plaintiff had degenerative changes in her spine with medically determinable findings of tenderness, muscle spasms, weakness, disturbed sensation, and limited motion. There was evidence that she had difficulty using her hands for grasping due to weakness in grip strength. Plaintiff had increased complaints of back and leg pain. There was also evidence that plaintiff had lower extremity pain, weakness, and disturbed sensation that would reasonably require the use of an assistive device. A single reference to using marijuana is not relevant, according to plaintiff.

**<u>Analysis.</u>**

<u>Treating Doctors' Opinions</u>.  Plaintiff argues that the Administrative Law Judge erred in rejecting the opinions of Drs. Rohrer and Tribuzio.

<u>Treating Doctor: Legal Standard</u>.  A treating doctor's opinion[1] on the issue of disability is entitled to greater weight than that of a physician who has examined plaintiff on only one occasion or who has merely conducted a paper review of the medical evidence of record.  20 C.F.R. § 404.1527(d)(1).  *Hurst v. Schweiker*, 725 F.2d 53, 55 (6th Cir. 1984); *Lashley v. Secretary of Health and Human Services*, 708 F.2d 1048, 1054 (6th Cir. 1983).  The Commissioner's regulations explain that Social Security generally gives more weight to a treating doctors' opinions because treators are usually "most able to provide a detailed, longitudinal picture" of the claimant's medical impairments. 20 C.F.R. § 404.1527(d)(2).  When the treating doctor's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record" the Commissioner "will give it controlling weight. " *Id.*

---

[1]The Commissioner's regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2). Treating sources often express more than one medical opinion, including "at least one diagnosis, a prognosis and an opinion about what the individual can still do." SSR 96-2p, 1996 WL 374188, at *2. When an administrative law judge fails to give a good reason for rejecting a treator's medical opinion, remand is required unless the failure does not ultimately affect the decision, *i.e.*, the error is *de minimis*. *Wilson*, 378 F.3d at 547. So reversible error is not committed where the treator's opinion "is patently deficient that the Commissioner could not possibly credit it;" the administrative law judge's findings credit the treator's opinion or makes findings consistent with it; or the decision meets the goal of 20 C.F.R. § 1527(d)(2) but does not technically meet all its requirements. *Id.*

Even though a claimant's treating physician may be expected to have a greater insight into his patient's condition than a one-time examining physician or a medical adviser, Congress specifically amended the Social Security Act in 1967 to provide that to be disabling an impairment must be "medically determinable." 42 U.S.C. §423(d)(1)(A). Consequently, a treating doctor's opinion does not bind the Commissioner when it is not supported by detailed clinical and diagnostic test evidence. *Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir. 2004); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779-780 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1983); *Halsey v. Richardson*, 441 F.2d 1230, 1235-1236 (6th Cir. 1971); *Lafoon v. Califano*, 558 F.2d 253, 254-256 (5th Cir. 1975). 20 C.F.R. §§404.1513(b), (c), (d), 404.1526(b), and 404.1527(a)(1)[2].

The Commissioner's regulations provide that she will generally "give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." 20 C.F.R. § 404.1527(d)(1). When a treating source's opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case

---

[2]Section 404.157(a)(1) provides:
You can only be found disabled if you are unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. See §404.1505. Your impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. See §404.1508.

record, we will give it controlling weight." 20 C.F.R. § 404.1527(d)(2). In determining the weight to assign a treating source's opinion, the Commissioner considers the length of the relationship and frequency of examination; nature and extent of the treatment relationship; how well-supported the opinion is by medical signs and laboratory findings; its consistency with the record as a whole; the treating source's specialization; the source's familiarity with the Social Security program and understanding of its evidentiary requirements; and the extent to which the source is familiar with other information in the case record relevant to decision. *Id.* Subject to these guidelines, the Commissioner is the one responsible for determining whether a claimant is disabled. 20 C.F.R. § 404.1527(e)(1).

Social Security Ruling 96-2p provides that "[c]ontrolling weight cannot be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." Consequently, the decision-maker must have "an understanding of the clinical signs and laboratory findings and what they signify." *Id.* When the treating source's opinion "is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight . . . ." The Commissioner's regulations further provide that the longer a doctor has treated the claimant, the greater weight the Commissioner will give his or her medical opinion. When the doctor has treated the claimant long enough "to have obtained a longitudinal picture of your impairment, we will give the source's

[opinion] more weight than we would give it if it were from a non-treating source."  20

C.F.R. §404.1527(d)(2)(I).

The Commissioner has issued a policy statement about how to assess treating

sources' medical opinions.  Social Security Ruling 96-2p.  It emphasizes:

1. A case cannot be decided in reliance on a medical opinion without some reasonable support for the opinion.

2. Controlling weight may be given only in appropriate circumstances to medical opinions, *i.e.*, opinions on the issue(s) of the nature and severity of an individual's impairment(s), from treating sources.

3. Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.

4. Even if a treating source's medical opinion is well-supported, controlling weight may not be given to the opinion unless it also is "not inconsistent" with the other substantial evidence in the case record.

5. The judgment whether a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record requires an understanding of the clinical signs and laboratory findings and what they signify.

6. If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight; *i.e.*, it must be adopted.

7. A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected.  It may still be entitled to deference and be adopted by the adjudicator.

Even when the treating source's opinion is not controlling, it may carry sufficient

weight to be adopted by the Commissioner:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and labora-tory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weigh-ed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

The case law is consistent with the principals set out in Social Security Ruling 96-2p. A broad conclusory statement of a treating physician that his patient is disabled is not controlling. *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). For the treating physician's opinion to have controlling weight it must have "sufficient data to support the diagnosis." *Kirk v. Secretary of Health and Human Services*, 667 F.2d 524, 536, 538 (6th Cir. 1981); *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). The Commissioner may reject the treating doctor's opinions when "good reasons are identified for not accepting them." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir. 1988); 20 C.F.R. § 404.1527(d)(2)("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). Even when the Commissioner determines not to give a treator's opinion controlling weight, the decision-maker must evaluate the treator's opinion using the factors set out in 20 C.F.R. § 404.1527(d)(2). *Wilson,* 378 F.3d at 544; *Hensley v. Astrue,* 573 F.3d 263, 266 (6th Cir. 2009). There remains a rebuttable

presumption that the treating physician's opinion "is entitled to great deference." *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242 (6th Cir. 2007); *Hensley*, above. The Commissioner makes the final decision on the ultimate issue of disability. *Warner v. Commissioner of Social Security,* 375 F.3d at 390; *Walker v. Secretary of Health & Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 855 (6th Cir. 1986); *Harris v. Heckler*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958 n.1 (11th Cir. 1982).

Treating Doctor: Discussion. With respect to Dr. Rohrer, the administrative law judge stated:

> In deciding the claimant's mental residual functional capacity, the Administrative Law Judge did not attach any significant weight to the reports completed by Dr. Rohrer (Exhibits 12F, 34F). Dr. Rohrer initially reported that the claimant was moderately limited in her ability to understand, remember and carryout simple instructions and to maintain attention and concentration, but did not describe the nature of the limitations or otherwise explain what she meant by "moderate" (Exhibit 12F, p. 4). Likewise, Dr. Rohrer reported that the claimant had "marked" limitations in a number of work-related areas, but did not provide any cogent medical rationale as to how she reached these conclusions or explain what she meant by "marked" (Exhibit 12F). Furthermore, Dr. Rohrer reported that the claimant's "physical illnesses have <u>major</u> impact on her emotional status" and she further indicated that claimant reported that "physical pain [is her] major problem (Exhibit 12F, p. 8; Exhibit 13F, p. 15). Because there is no evidence documenting that Dr. Rohrer performed a physical examination of the claimant and the other evidence as detailed above casts considerable doubt on any such underlying physical complaints, the Administrative Law Judge has concluded that the claimant is not a reliable source of factual information. Therefore, the Administrative Law Judge finds that any such reliance was misplaced. As noted above, even Dr. Rohrer's associates questioned the claimant's reliability.

The Administrative Law Judge further finds that Dr. Rohrer's recommended course of treatment does not support a conclusion that the claimant has been limited to the extent that her assessment suggests. Dr. Rohrer reported that the claimant required only one 30 minute session per month medication management visit, and one 15 minute per month clinic visit (Exhibit 13F, p. 7). As noted above, the record establishes treatment on a less frequent basis. In fact, Dr. Rohrer saw the claimant in May 2008, after not seeing her for seven months and reported that she did not need to be seen until two months later (Exhibit 20F, p. 1).

The only "marked" limitation identified by Dr. Rohrer in the November 2008 assessment was with the claimant's ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest breaks (Exhibit 34F, p. 5). Again, Dr. Rohrer did not explain what she meant by "marked" or otherwise explain how she reached this conclusion. Dr. Rohrer reported that the claimant's primary "symptom" was "poor sleep." Indeed, this was the claimant's primary complaint in September 2008 (Exhibit 33F, p.1). Nevertheless, the claimant denied being tired during the day and said that she did not take naps (Exhibit 33F, p. 1). This suggests that any "poor sleep" would not interfere with her ability to function during the day or to perform at a consistent pace without an unreasonable number and length of rest breaks. Therefore, the Administrative Law Judge finds that Dr. Rohrer's report that the claimant would need an unreasonable number and length of rest breaks is inconsistent with her treatment records and therefore not entitled to controlling weight.

(R. 32-33.)   Here, the administrative law judge gave sufficient reasons to reject the

opinion of Dr. Rohrer. Despite the administrative law judge's statement that Dr. Rohrer

failed to define the terms "moderate" and "marked", the form defines these terms. *See*

R. 333-34. Nevertheless, the administrative law judge gave sufficient reasons for not

adopting the opinion of Dr. Rohrer. The administrative law judge found that Dr.

Rohrer's recommended course of treatment was inconsistent with her assessment of

plaintiff's impairment. Despite her recommendation of monthly visits, plaintiff's

treatment was less frequent. Dr. Rohrer concluded that plaintiff's physical illness contributed significantly to mental impairment, yet Dr. Rohrer did not have the expertise to evaluate her physical impairments. The administrative law judge concluded that plaintiff's allegations concerning her symptoms were not entirely credible and that Dr. Rohrer's opinion was, in large part, based on those allegations. As a result, the administrative law judge concluded that Dr. Rohrer's opinion was not entitled to deference. The administrative law judge also concluded that Dr. Rohrer's opinion was not supported by other substantial evidence in the record including the opinions of Dr. Lucas and Dr. Hamrick.

The administrative law judge rejected the opinion of Dr. Tribuzio:

In deciding that the claimant has been able to perform the activities described in Dr. Barquet's testimony, the administrative law judge also considered Dr. Tribuzio's progress notes which contain statements indicating that the claimant cannot work or seek employment due to pain. (See e.g., Exhibit 14F, pp. 2, 9, 11, 12, 13,; Exhibit 19F, p. 1; Exhibit 30F, p. 2). The administrative has not attached any weight to these reports as these reports are not medical opinions under the Social Security regulations, but rather, are legal conclusions left to the Administrative Law Judge (20 C.F.R. § 404.1527(e)(1) and Social Security Ruling 96-5p).

Even if Dr. Tribuzio identified function-by-function limitations, the Administrative Law Judge would have concluded that they were not supported by his own progress notes and were inconsistent with the other normal physical examination findings in the record. The 11th Circuit has ruled that the opinion of a treating physician "must be given substantial or considerable weight unless 'good cause' is shown to the contrary" and that "good cause" exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. Lewis V. Callahan, 125 F.3d 1426, 1440 (11th Cir. 1997). Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. Ga.

2004). There is no evidence which "bolsters" Dr. Tribuzio's reports. Indeed, his reports are contradicted by the essentially normal physical examinations from Baptist Medical Center. Furthermore, the Administrative Law Judge questions whether Dr. Tribuzio is familiar with the claimant's medical history, as he indicated that the claimant "has chronic back pain, has had surgery in the past" (Exhibit 32F, p. 1) while the claimant reported that her only surgeries were for a breast reduction and an appendectomy (Exhibit 5F, p. 2; Exhibit 22F, p. 6).

(R. 31-32.) The administrative law judge also gave good reasons for rejecting the opinion of Dr. Tribuzio. The administrative law judge reviewed Dr. Tribuzio's treatment notes and concluded that his opinion that plaintiff was disabled was without support in the record. Dr. Tribuzio's treatment notes failed to document any clinical findings consistent with his opinion. Plaintiff argues that if the administrative law judge had believed that Dr. Tribuzio's findings could not be given sufficient weight because of a lack of objective findings in the treatment notes, he had an affirmative duty to develop the record. It is the claimant, however, who bears the burden of providing medical evidence demonstrating impairments and their severity. 20 C.F.R. §404.1512(c). The administrative law judge was not required to seek additional information from Dr. Tribuzio when his treatment notes failed to provide any support for his opinion that plaintiff's impairment was disabling.

Credibility Determinations: Controlling Law. Pain is an elusive phenomena. Ultimately, no one can say with certainty whether another person's subjectively disabling pain precludes all substantial gainful employment. The Social Security Act requires that the claimant establish that he is disabled. Under the Act, a "disability" is

defined as "inability to engage in any substantial gainful activity <u>by reason of any</u> <u>medically determinable or mental impairment</u> which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. §423(d)(1)(A) (emphasis added).

Under the provisions of 42 U.S.C. §423(d)(5)(A):

> An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability.

The Commissioner's regulations provide:

> (a) *General*. In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in §404.1528(b) and (c). By other evidence, we mean the kinds of evidence described in §§404.1512(b)(2) through (6) and 404.1513(b)(1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis,

prescribed treatment, daily activities, efforts to work and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work. However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. §404.1529(a).

In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986) the Sixth Circuit established the following test for evaluating complaints of disabling pain. First, the Court must determine "whether there is objective medical evidence of an underlying medical condition." If so, the Court must then

examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether

the objectively established medical condition is of such a severity that
it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853. Any "credibility determinations with respect to subjective

complaints of pain rest with the ALJ." *Siterlet v. Secretary of Health and Human Services*,

823 F.2d 918, 920 (6th Cir. 1987).

    <u>Credibility Determination: Discussion</u>. The administrative law judge concluded

that plaintiff's allegations concerning the severity of symptoms were not credible:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be
> expected to cause some of her alleged symptoms; however the claimant's
> statements concerning the intensity, persistence and limiting effects of
> these symptoms are not credible to the extent they are inconsistent with
> the above residual functional capacity assessment.

> In terms if the claimant's alleged inability to work due to "constant" back
> pain, for the reasons described above, the Administrative Law Judge has
> concluded that the record does not establish any medically determinable
> physiological basis for her back impairment. The Administrative Law
> Judge has, however, considered the possibility that the claimant could be
> suffering from some back pain as a result of her obesity. The claimant's
> testimony of dropping things is inconsistent with Dr. Ullah's report that
> the claimant's grip strength was normal and equal bilaterally and that her
> finger dexterity was preserved (Exhibit 5F, p. 3) . Her testimony of leg
> numbness two to three times a week is not corroborated by complaints to
> treating sources and abnormal clinical findings. Her testimony of "being
> scared most of the time" and feeling helpless 70% of the time is not
> corroborated by evidence of intensive mental health treatment or
> complaints to treating mental health sources. Her testimony of disabling
> depression is not corroborated by reports from Dr. Rohrer, her treating
> psychiatrist, as the claimant does not carry a diagnosis of depression.

> The claimant's credibility, in general, is brought into question as a result
> of her inconsistent statements about her living situation and her marijuana
> usage. When the claimant filed her application for supplemental security
> income, she reported to the Social Security Administration that she was

living alone (Exhibit SSI-1, p. 2; Exhibit 4E, p. 1) and she told Dr. Lucas that her boyfriend "visits" (Exhibit 4F, p. 2). In January 2007, the claimant reported that she has been living with her boyfriend for the past five years and that he delivers pizza for Domino's (Exhibit 13F, pp. 9, 16). On March 2, 2007, Donna Mitchell reported that the claimant "rents from me" and owed past-due rent of $2,625.00 (Exhibit 9E, p. 1). Additionally, Ms. Mitchell reported that the claimant owed a remaining balance of $1,000.00 on her vehicle which she stated would be repossessed (Exhibit 9E, p. 1). The claimant, however, told the Social Security Administration that she did not own a car (Exhibit SSI-1).

The claimant's credibility is further brought into question as Dr. Lucas noted that the claimant had a histrionic presentation. Dr. Hamrick testified that this suggests than an individual has a tendency to be overly dramatic or to exaggerate. As noted above, multiple medical sources of record have questioned the claimant's allegations. Additionally, the claimant told sources at Sutton Behavioral that she has been suffering from a number of conditions that are not corroborated by the medical record such as multiple sclerosis and leg degeneration (Exhibit 13F, p. 11). Indeed, even Dr. Rohrer's co-workers questioned the claimant's reliability as the Evaluation for Adult Services documents that the Mental Health Intern and the Reviewer were "Not sure about client as reliable historian" (Exhibit 13F, p. 23). Furthermore, the claimant has made much of an alleged "poor appetite" (see Exhibit 13F, pp. 1, 2, 3, 8; Exhibit 12F, p. 3; exhibit 20F, p. 1) yet the claimant has nevertheless managed to maintain a weight in the 200 pound range.

Overall, the claimant has not offered any reasonable explanation as to why she stopped working. Her testimony that she was fired for being "sick" is not corroborated by evidence of illness in her treatment records which is contemporaneous with her alleged disability onset date. The claimant admitted that she has not participated in vocational rehabilitation or any other employment services that would help her go to work (Exhibit 7E, p. 6; Exhibit 8E, p. 6; Exhibit 12E, p. 4; Exhibit 15E, p. 7). Rather, the claimant told Dr. Tribuzio that her plan was to go on disability (Exhibit 14F, p. 14).

(R. 29-30.) Here, the administrative law judge properly considered whether objective

medical evidence supported plaintiff's allegations of disabling pain. Furthermore, the

administrative law judge considered inconsistent statements made by plaintiff in

addition to statements made by treatment providers that she exaggerated her symptoms. As a result, the administrative law judge's credibility determination is supported by substantial evidence.

From a review of the record as a whole, I conclude that there is substantial evidence supporting the administrative law judge's decision denying benefits. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner of Social Security be **AFFIRMED.** It is **FURTHER RECOMMENDED** that plaintiff's motion for summary judgment be **DENIED** and that defendant's motion for summary judgment be **GRANTED.**

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also, Small v. Secretary of Health and Human Services*, 892 F.2d 15, 16 (2d Cir. 1989).

 s/Mark R.  Abel
United States Magistrate Judge